852 So.2d 1247 (2003)
STATE of Louisiana, Appellee,
v.
Edward Ray TROTTER, Jr., Appellant.
No. 37,325-KA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2003.
*1249 John Cucci, Jr., for Appellant.
Edward Ray Trotter, Jr., Pro Se.
Paul M. Carmouche, District Attorney, Edward M. Brossette, J. Thomas Butler, Assistant District Attorneys, for Appellee.
Before WILLIAMS, CARAWAY and MOORE, JJ.
CARAWAY, J.
A jury convicted the defendant of possession of a Schedule II CDS (Cocaine), 28 grams or more but less than 200 grams. He was adjudicated a third felony habitual offender and sentenced to serve a term of life imprisonment without benefits. The defendant now appeals. For the following reasons, the defendant's conviction and sentence are affirmed.

Facts
On or about October 7, 1999, the defendant, Edward Ray Trotter, Jr., ("Trotter") was placed under surveillance when officers with the Caddo Bossier Narcotics Task Force ("Task Force") received a tip from a confidential informant ("CI") that someone was selling drugs on Midway Street in Shreveport. The Task Force orchestrated two controlled buys between the CI and Trotter, both of which occurred at Trotter's residence on October 7, 1999. Later, the Task Force sought and obtained a search warrant for the residence. While the Task Force was getting ready to execute the warrant at approximately 6:00 p.m. on October 8, officers observed Trotter as he left the residence in a vehicle with another man, a woman, and a baby. Two officers in a patrol unit followed the vehicle, observed a traffic violation and initiated a stop, during which stop the vehicle was searched and 4.4 grams of crack cocaine was recovered from the baby's diaper.
Trotter was arrested and returned to his residence, where the Task Force, including a canine unit, was executing the warrant. Five or six female children between twelve and sixteen years old were at the house. Trotter's girlfriend, Alicia Tucker, who resided at the house, arrived home from work while the search was in progress. She was also handcuffed as the result of an officer's discovery of a large amount of crack cocaine in a hallway attic. During the search, Trotter gave a confession concerning his possession of the cocaine.
The amount of recovered crack cocaine, which totaled approximately 58 grams, was enough for approximately 580 unit doses, street-valued at about one hundred dollars per gram. Forensic tests conducted later confirmed the substance consisted of 57.4 grams of crack cocaine. Some unused baggies and $2,000 cash, including $240 in buy money from the previous undercover sting operation, were recovered from a man's black jacket located in a bedroom closet.
The initial bill of information charged Trotter with one count of violating La. R.S. 40:967(F)(1)(a), which is a possession charge of a Schedule II CDS (over 28, but less than 200 grams), "on or about October 8, 1999." The record also contains an "Amended Bill of Information." The amended bill charged Trotter with two counts of distribution of a Schedule II CDS in violation of La. R.S. 40:967(A)(1) and one count of Possession of a Schedule II CDS (Over 28, But Less Than 200 Grams), "on or about October 7, 1999."
The defendant's pre-trial motion to suppress the drug evidence and to quash the warrant for the search and any oral statements made to police was denied after hearings were held. At trial, in addition to the facts and circumstances related above, the defense presented testimony of Kenneth Pennington, Tucker's cousin, who *1250 asserted that the crack cocaine found in the attic of the residence belonged to him. Pennington admitted that he is a convicted felon currently serving time for armed robbery and has two prior convictions for burglary.
After the State rested, defense counsel moved for a judgment of acquittal based upon the discrepancy between the date of the offense contained in the bill of information (October 7, 1999) and the evidence adduced at trial which indicated that the crime was allegedly committed on October 8, 1999. The trial court denied the defense motion and ruled that based upon the reasoning of State v. Winnon, 28,654 (La. App.2d Cir.9/25/96), 681 So.2d 463, writ denied, 96-2576 (La.3/27/97), 692 So.2d 391, the date of the offense was not an essential element in the bill of information.
After the trial, the defendant was convicted as charged. Thereafter, the defendant's post-trial motions were denied. He was found to be a third felony habitual offender and sentenced to serve a term of life imprisonment without benefits. The defendant now appeals.

Discussion
Trotter assigns as error the listing of October 7, 1999 in the amended bill of information as the date of the possession offense. Since the state's case focused on his possession of the 57.4 grams of cocaine recovered by the search of Trotter's residence on October 8, 1999, Trotter insists that the state presented insufficient evidence of any possession of cocaine on October 7. Moreover, Trotter argues that since the charged crime of distribution of cocaine did relate to activities on October 7, 1999, the defense was prejudiced by the confusion caused by listing the October 7 date in the amended bill. That prejudice presumably caused the defense to prepare only to defend against the alleged activities involving the CI's purchases of drugs on October 7.
La.C.Cr.P. art. 468 provides that the date of commission of an offense need not be alleged unless it is essential to the offense. When the date is not essential to the offense, an indictment shall be not held insufficient if it does not state the proper date, even if it states the offense to have been committed on an impossible day such as a day after the return of the indictment. State v. Winnon, supra. The jurisprudence holds that this immaterial defect of form is not a ground for relief where the defendant made no motion for recess and did not contend he was surprised or prejudiced by the error. Id.; State v. Hernandez, 410 So.2d 1381 (La.1982).
In this case, the amended bill of information did change the date from October 8 on the original bill to October 7. Nevertheless, each listing was an approximate date since both bills utilized the "on or about" language with the dates. Since the amended bill added two distribution charges, coinciding with the transactions on October 7, the change in date could be understood in light of those additional charges. Those charges, however, were dropped by the state and were not presented during trial at the reading of the amended bill to the jury before the opening statements. The reading to the jury of the possession charge in the amended bill was made with the "on or about October 7" date. Most importantly, the date is not essential to the crime of possession of Schedule II CDS. La. R.S. 40:967(F)(1)(a). Therefore, failure to prove Trotter's possession on October 7 was immaterial to the establishment of the charged offense.
We likewise find no merit to the claim of surprise or prejudice. After the filing of the amended bill of information in November, 2000, Trotter proceeded with his motion to suppress his confession and the *1251 search of his residence and to quash the warrant leading to the search. All of those events pertained to the October 8 search of Trotter's residence and were subject to pre-trial hearings. The defense therefore understood that the charges involved more than just the alleged sales of cocaine on October 7. At the trial following the reading of the amended bill and throughout the presentation of the state's case, no objection was made nor surprise indicated by the defense regarding the state's focus on the October 8 search of the residence. Trotter's alibi defense pertained to the drugs discovered on October 8. Accordingly, finding no evidence of prejudice, this assignment of error has no merit.
Secondly, Trotter assigns as error the failure to suppress his confession to police which occurred during the search of his residence. He argues that he only admitted knowledge of possession of the cocaine after the officers threatened to take everyone in the house to jail, including his former girlfriend, her teenage daughters, and their friends. This threat of "family prosecution" is the basis for Trotter's claim that his confession was involuntary.
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La. App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, 00-1427 (La.5/11/01), 791 So.2d 1288; State v. Rogers, 476 So.2d 942 (La. App. 2d Cir.1985). Before a confession can be introduced into evidence, the state must affirmatively prove that it was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C.Cr.P. art. 703(D); State v. Roddy, supra. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Roddy, supra; State v. Walker, 28,577 (La.App.2d Cir.10/4/96), 681 So.2d 1023.
In State v. Jackson, 381 So.2d 485 (La.1980) and State v. Morvant, 384 So.2d 765 (La.1980), the Louisiana Supreme Court stated the principles under which the admissibility of a confession must be judged. As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. State v. Roddy, supra. In Louisiana, the statutorily mandated test for voluntariness is not whether a confession was induced by improper external forces, but whether the confession was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451; State v. Roddy, supra.
The admissibility of a confession is a question for the trial court. State v. Roddy, supra. When determining admissibility, the trial court's conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Roddy, supra; State v. Dailey, 607 So.2d 904 (La.App. 2d Cir.1992), citing State v. Jackson, supra. We place great weight upon the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Roddy, supra; State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082. Also see State v. Durr, 28,197 (La. App.2d Cir.6/26/96), 677 So.2d 596; State v. English, 582 So.2d 1358 (La.App. 2d Cir.1991), writ denied, 584 So.2d 1172 (La. *1252 1991). Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Henderson, 31,986 (La.App.2d Cir.8/18/99), 740 So.2d 240; State v. Pittman, 585 So.2d 591 (La.App. 5th Cir.1991), writ denied, 586 So.2d 545 (La.1991).
In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
During the nearly three-hour search, Trotter, Tucker and the adolescents were all segregated from each other in the house. Tucker said that she and Trotter were never questioned together. She was questioned in her daughter's bedroom. Detective Horne testified that at one point, when Trotter and Tucker were brought together, he explained to them that they would probably be going to jail because of the discovery of cocaine in their residence. Trotter initially denied any knowledge of the cocaine.
After Detective Horne advised Trotter of his Miranda rights, he interviewed him in the living room, in the presence of Sergeant Rehak. Detective Horne testified that he made no menacing statements, threats, inducements or promises to make the defendant give a statement. Trotter claimed that the narcotics belonged to him and that he purchased them from someone in Bossier City earlier that day. The defendant accurately described the amount, packaging and location of the cocaine to Sergeant Rehak. Detective Horne testified that Trotter's statement was freely and voluntarily given. After Trotter confessed, Tucker was taken out of the handcuffs.
Tucker testified that when she arrived home, an officer grabbed her purse and threatened to take everybody to jail. After she entered the residence, she found the some of the children handcuffed in the living room. Three children were hers. Her two older girls, ages 15 and 13, and two or three neighborhood children were handcuffed. Her younger son was not. Some children were sitting on the couch and some were lying on the floor. Tucker stated that she did not know whether the police had threatened the children. She also admitted that at one point she was asked by the police if there was anywhere else for the children to go. Officer Rehak indicated that the older adolescents were handcuffed, but not for "very long," and that the children were secured together where they could be observed for safety reasons.
Under these circumstances, the officer's advising the two adults that they would probably go to jail because of the cocaine discovery at their residence was not coercive. It was a statement of what properly could occur. Although some of the adolescents were handcuffed while the search was executed, there was no showing that that was used to intimidate and coerce Trotter's later confession. The officer denied threatening to jail the children, and Tucker admitted that she never heard such threat.
Regarding the actual interrogation of Trotter, the testimony of the interviewing officer alone may be sufficient to prove the voluntariness of the statement. See State v. Henderson, supra; State v. Pittman, supra. The interviewing officer's testimony was corroborated in large part by testimony of other officers who were present on the scene. This court places great weight upon the trial court's factual determinations and credibility assessments, and *1253 the trial court did not err in determining that the state met its burden of proving that the defendant's statement was free and voluntary. See State v. Roddy, supra and State v. Crews, supra. This assignment of error is therefore without merit.
Next, Trotter claims that the trial court erred when it failed to suppress the search of the residence on the basis of the insufficiency of the search warrant. In his motion to suppress, Trotter alleged the existence of the affidavit in support of the search warrant and its recitals concerning purchases of crack cocaine by the CI on October 7. The motion attacked the CI alleging that he was "unreliable and was not provided the buy money" for the purchase by the Task Force. At the hearing, the affiant, Detective Horne, testified concerning the two purchases by the CI which served as the basis for the search warrant. Detective Horne also related his prior experience with the CI. The defense presented no evidence disputing the facts contained in the affidavit and the trial court refused to invalidate the warrant. Trotter now argues that the trial court erred because the state never placed the warrant into evidence at the hearing on the motion to suppress.
This argument ignores the recognition by Trotter in his motion to suppress of the supporting substance for the search warrant and the defense burden for attacking the warrant. An affidavit supporting a search warrant is presumed to be valid. When a defendant proves that an affidavit contains false statements, it should be determined whether the misrepresentations are intentional or unintentional. Defendant must prove by a preponderance of the evidence that the affidavit contains intentional misrepresentations. See State v. Fugler, 97-1936 (La.App. 1st Cir.9/25/98), 721 So.2d 1, rehearing granted, amended on rehearing in part, 97-1936 (La.App. 1st Cir.5/14/99), 737 So.2d 894, writ denied, 99-1686 (La.11/19/99), 749 So.2d 668.
In State v. Johnson, 27,522 (La.App.2d Cir.12/06/95), 665 So.2d 1237, this court set forth the applicable law:
Probable cause exists when the facts and circumstances within the affiant's knowledge and of which he has reasonable trustworthy information are sufficient to support a reasonable belief that an offense has been committed or that evidence or contraband may be found at the place to be searched.
* * *
Making material and intentional misrepresentations to a magistrate constitutes a fraud upon the courts and will result in the invalidation of the warrant and suppression of the items seized. A defendant bears the burden of going forward on an allegation that an application for a search warrant contains intentional misrepresentations such as would make it invalid. If the misrepresentations or omissions are inadvertent or negligent, the warrant will be retested for probable cause after striking the misrepresentations or supplying the omissions. (Citations omitted)
Also see State v. Mann, 431 So.2d 862 (La.App. 2d Cir.1983), writ denied, 439 So.2d 1074 (La.1983).
From this law, the state was not required to place the warrant into evidence. The defense motion recognized the substance of the supporting affidavit and the warrant, and the affiant was cross examined regarding the facts. The affidavit was presumed to be valid, and its substance was before the court. The defense presented no evidence demonstrating that the affidavit contained an intentional misrepresentation and makes no argument to *1254 this court of such deficiency. This assignment of error is without merit.
The next assignment of error concerns Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and challenges made by the defense and rejected by the trial court. During the jury selection process, the defense made a general challenge that the state exercised nine out of ten peremptory challenges to black prospective jurors. Finding a prima facia case supporting the challenge, the trial court went through the entire list of the peremptory challenges and required the state to give race-neutral explanations. The trial court found race-neutral reasons were given for peremptory challenges to prospective jurors Sudds, James and Taylor, which Trotter now disputes. The trial court found that insufficient race-neutral reasons were given for prospective juror Black.
The United States constitution prohibits the State from engaging in purposeful discrimination on the grounds of race in the exercise of peremptory challenges. Batson, supra. Louisiana law codifies the Batson ruling in La.C.Cr.P. art. 795 C, which provides:
No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.
The race-neutral explanation need not be persuasive or even plausible. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory exception. State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999). The trial court's findings with regard to a Batson challenge are entitled to great deference on appeal. Id.; Purkett v. Elem, supra. The finding of the absence of discriminatory intent comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy. Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).
Trotter's argument seeks a comparative analysis of the stricken venire persons' responses to those responses by other jurors. The comparison of the treatment of the potential jurors of different races is essential to the establishment of the initial prima facie case and has been utilized by our supreme court in the measurement of the racially-neutral reason for the exercise of the prosecution's challenge. In reversing the conviction under Batson in State v. Harris, 01-0408 (La.6/21/02), 820 So.2d 471, 476, the court stated:
The state also proffered that it was striking Brown because he was single and had no children. This justification is also unpersuasive as the record reflects that the state did not attempt to strike childless single white male venirepersons *1255 Louviere, Bordelon, Hidalgo, Lasana, or Daigle.
This issue of comparative juror analysis has also been discussed in opinions of the federal circuit courts of appeal. In United States v. Guerra-Marez, 928 F.2d 665, 673 n. 9. (5th Cir.), cert. denied, 502 U.S. 969, 112 S.Ct. 443, 116 L.Ed.2d 461 (1991), the court noted that:
With respect to the defendant's argument that other similarly situated veniremen were not challenged, "the defendant bears the burden of convincing the district court that the proffered reasons are pretextual by introducing evidence of comparability."
Accord, United States v. McMillon, 14 F.3d 948, n. 5 (4th Cir.1994).
The Eighth Circuit has stated that peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged. Devose v. Norris, 53 F.3d 201 (8th Cir.1995). Contrast, Burks v. Borg, 27 F.3d 1424 (9th Cir.1994) (noting that "the U.S. Supreme Court has not yet ruled on the role of comparative analysis in appellate review.")
The defense contended that the purported race-neutral explanations for excluding the African Americans from the jury were a mere pretext because the white jurors were not excluded on the same basis. Particularly, it was argued that the state sought to strike prospective jurors Sudds, Taylor and James because of their views that drug use is a "personal choice." However, the defense contended that white jurors, Connell and Rately, who gave the same or similar answers, were not sought to be excluded by the state.
A review of the record indicates that jurors, Sudds and Taylor, were excluded following race-neutral explanations pertaining to matters other than their drug use views expressed during voir dire. Accordingly, Trotter's argument regarding the exclusion of those jurors is factually incorrect.
Regarding the questioning of juror, James, the record reveals the following exchange:
Q.... Do you think the laws as written right now are good or do you think it should be someone's personal choice whether they want to do drugs?
A. (Mr. Miller) Each man to his own. He's got a right to do what he wants to do.
Q. Ms. Scott, how do you feel? I'm sorry, Ms. James.
A. (Ms. James) I think each his own. They can do whatever they like, I guess.
In contrast to James's response, the responses of the two white jurors cited by Trotter in his argument both indicated that while drug use may be a personal choice, the law should be followed and applied. The comparative juror argument, therefore, fails to demonstrate that the responses of James and the two white jurors were the same. The race-neutral response given by the state for James could support a finding of no discriminatory intent, and the decision of the trial court to exclude James was within its discretion. This assignment of error is without merit.

Decree
For the foregoing reasons, that the defendant's conviction and sentence are affirmed.
AFFIRMED.